FILED
2026 Sep-23 PM 04:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**JASPER DIVISION**

| | | |
|---|---|---|
| KIMBERLEY PARKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 6:25-cv-01214-NAD |
| SOCIAL SECURITY ADMINISTRATION, COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**
**AFFIRMING THE DECISION OF THE COMMISSIONER**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Kimberley Parks appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability benefits. Doc. 1. Plaintiff Parks applied for benefits with an alleged onset date of December 31, 2016.[1] Doc. 10-4 at 27, 39; Doc. 10-7 at 2–10. The Commissioner denied Parks' claim for benefits. Doc. 10-22 at 2–24. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 27; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and

[1] The pertinent time period for review was later determined to begin on March 30, 2021. Doc. 10-22 at 6.

the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Parks argues that the court should reverse and remand (1) because the Administrative Law Judge (ALJ) "erred at Step Two by finding Ms. Parks' polyneuropathy as a non-severe impairment" and failed to account for limitations based on Parks' neuropathy, and (2) because the ALJ failed to properly evaluate Parks' credibility regarding her migraines. Doc. 18 at 16, 19.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To qualify for disability benefits, a claimant must show disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505.

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for

disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

> (1) whether the claimant is engaged in substantial gainful activity;
>
> (2) if not, whether the claimant has a severe impairment or combination of impairments;
>
> (3) if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;
>
> (4) if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and,
>
> (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national

economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or

substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. And the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th

Cir. 1991).

## BACKGROUND

### A. Parks' personal and medical history

Parks was born on March 8, 1974. Doc. 10-4 at 27. She has a history of opioid dependence. *See, e.g.*, Doc. 10-14 at 4, 6. Parks has sought Social Security benefits on several occasions and her prior applications have been denied. *See, e.g.*, Doc. 10-23.

On April 20, 2020, Parks called and spoke to Deborah Dyar, a nurse practitioner, at Jerry Harrison Family Practice, her primary care provider's office. Doc. 10-14 at 58. Parks had opioid dependence and lumbar pain and was requesting a refill of Suboxone for opioid dependence and pain. Doc. 10-14 at 58. She was taking Gabapentin[2] for neuropathy. Doc. 10-14 at 58–59. She was able to perform activities of daily living with pain medication. Doc. 10-14 at 59.

On May 18, 2020, Parks had a telephone visit with Nurse Practitioner Dyar. Doc. 10-14 at 55. Parks was noted as having opioid dependence and low back pain that were stable with Suboxone, and unspecified polyneuropathy that was stable with Gabapentin. Doc. 10-14 at 55. She was able to perform activities of daily living with pain medication. Doc. 10-14 at 55.

[2] Throughout the record, references to the medications Gabapentin and Neurontin are used interchangeably. *See, e.g.*, Doc. 10-14 at 58–59.

On June 5, 2020, Parks underwent a left knee arthroscopy with extensive synovectomy. Doc. 10-9 at 19. Parks' chart described her as "a very pleasant 46-year-old female" with knee pain. Doc. 10-9 at 19.

On June 15, 2020, Parks had a telephone visit with Dr. Boyde Harrison, her primary care physician at Jerry Harrison Family Practice. Doc. 10-14 at 53. She had opioid dependence, neuropathy, hypertension, and low back pain. Doc. 10-14 at 53. She requested refills of Suboxone for opioid dependence and pain and Gabapentin for neuropathy, as well as other medications. Doc. 10-14 at 53.

On July 16, 2020, Parks had a disability physical with Stephanie Williams, a nurse practitioner. Doc. 10-35 at 166–69. She was taking Neurontin and Topamax, among other medications. Doc. 10-35 at 166. She walked into the exam "holding onto the walls" and reported using a walker "constantly," but did not bring a walker to the exam. Doc. 10-35 at 167. She reported constant pain and tingling and numbness, as well as having migraines four to five times per month. Doc. 10-35 at 167. Her gait was "slow and deliberate." Doc. 10-35 at 168.

On August 11, 2020, Parks saw Dr. Harrison complaining of a rash, depression, hypertension, polyneuropathy, anxiety, and opioid dependence. Doc. 10-14 at 48. She requested refills of medication including Suboxone for opioid dependence and Neurontin for neuropathy. Doc. 10-14 at 48–49.

On September 14, 2020, Parks saw Dr. Harrison complaining of headache and

requesting a Suboxone refill. Doc. 10-14 at 44. She was directed to take ibuprofen for headaches and was noted to have polyneuropathy that was stable with medication. Doc. 10-14 at 45.

On October 12, 2020, Parks saw Dr. Harrison with complaints of headache, depression, and opioid dependence. Doc. 10-14 at 41. She requested a refill of Suboxone. Doc. 10-14 at 41. Her exam was normal. Doc. 10-14 at 41. She was directed to take over-the-counter pain relievers and blood pressure medication for headaches. Doc. 10-14 at 42. She was noted to have polyneuropathy that was stable with medication. Doc. 10-14 at 42.

On November 9, 2020, Parks saw Dr. Harrison with complaints of opioid dependence, migraines three times per month, depression, and low back pain. Doc. 10-14 at 38. She requested refills of Suboxone, Topamax (for migraines), Oxaprozin, and Lexapro. Doc. 10-14 at 38. She was referred for an MRI for migraines. Doc. 10-14 at 39.

On December 7, 2020, Parks saw Dr. Harrison with complaints of opioid dependence, hypertension, and right knee pain. Doc. 10-14 at 34. She requested a refill of Suboxone and a referral. Doc. 10-14 at 34. Her exam was normal except for high blood pressure and painful range of motion. Doc. 10-14 at 34.

On January 4, 2021, Parks saw Dr. Harrison with complaints of opioid dependence, hypertension, and polyneuropathy. Doc. 10-14 at 31. She requested

refills of Suboxone for opioid dependence and Neurontin for neuropathy. Doc. 10-14 at 31–32.

On February 1, 2021, Parks saw Dr. Harrison with complaints of opioid dependence and breast tenderness. Doc. 10-14 at 29. She was referred for a mammogram and her Suboxone was refilled; her exam was normal. Doc. 10-14 at 29–30.

On February 9, 2021, Parks went to The Orthopedic Center with bilateral knee pain that was affecting her quality of life and activities of daily living. Doc. 10-9 at 5. She did not report other issues besides a history of depression and high blood pressure. Doc. 10-9 at 5. Her exam was essentially normal, with crepitus, mild swelling, and tenderness in the knees; she was grossly neurovascularly intact distally. Doc. 10-9 at 6. She was diagnosed with osteoarthritis and a potential meniscus tear. Doc. 10-9 at 7.

On March 1, 2021, Parks saw Karen Moore, a nurse practitioner at Jerry Harrison Family Practice, with a chief complaint of opioid dependence, as well as complaints of hypertension, depression, and migraines. Doc. 10-14 at 24. She stated that she had resumed smoking cigarettes. Doc. 10-14 at 24. She requested refills of her medications. Doc. 10-14 at 24. She was taking Topamax for migraines. Doc. 10-14 at 25.

On March 29, 2021, Parks saw Nurse Practitioner Dyar at Jerry Harrison

Family Practice. Doc. 10-14 at 21. She arrived with her husband and a grandchild. Doc. 10-14 at 21. Her chief complaint was opioid dependence and chronic lumbar pain. Doc. 10-14 at 21. She requested a refill of Suboxone. Doc. 10-14 at 21.

In April and May, 2021, Parks saw Dr. Harrison with opioid dependence and requested refills of Suboxone. Doc. 10-14 at 15, 18.

On June 1, 2021, at a follow-up appointment with Dr. Mark Randall after a lipoma removal, Parks stated that she was feeling "much better," and was able to "twist, bend over, and sleep better," and had "even chased her grandchild." Doc. 10-16 at 11.

On June 21, 2021, Parks saw Nurse Practitioner Dyar with a chief complaint of opioid dependence. Doc. 10-14 at 11. She also complained of depression, neuropathy, and migraines, among other things; she sought refills of Suboxone, Lexapro, Nexium, Gabapentin, Labetalol, and Topamax. Doc. 10-14 at 11. Her migraines were noted as managed with Topamax and her polyneuropathy was managed with Neurontin. Doc. 10-14 at 12. Parks reported that her pain was too severe to manage without medication, but that she could perform activities of daily living with pain medication. Doc. 10-14 at 12–13.

On August 2, 2021, Parks had an MRI of her spine; the results were essentially normal and the imaging was noted to be "very clean for a 47-year-old." Doc. 10-15 at 41–42, 51.

On August 11, 2021, Parks filled out a headache questionnaire. Doc. 10-8 at 56. She stated that she had experienced headaches since she was a teenager, her last headache was the previous day, no one knew the cause of her headaches, and she had weekly migraines. Doc. 10-8 at 56. She stated that her migraines typically lasted from two to three days to a week, and she had to stay in a very dark room during her headaches. Doc. 10-8 at 59.

On August 19, 2021, Parks' mother, Linda Murns, filled out a third-party function report for Parks. Doc. 10-8 at 40. Murns stated that Parks' function was limited by pain and anxiety; she did not explicitly mention neuropathy or migraines. Doc. 10-8 at 40–47. Murns stated that Parks used a cane to walk and help her not fall. Doc. 10-8 at 46.

On September 13, 2021, Parks saw Nurse Practitioner Dyar for a routine follow-up and medication refills. Doc. 10-15 at 152. Her migraines were noted to be "at goal." Doc. 10-15 at 153. Her neuropathy was noted to be stable with medication. Doc. 10-15 at 153.

On September 17, 2021, Parks filled out a function report. Doc. 10-8 at 62–73. She stated that when she had migraines she could not get out of bed. Doc. 10-8 at 62. She stated that her daughter had to help her with everything including bathing, and that she had to have a potty chair by her bed. Doc. 10-8 at 67. She stated she could not pick up anything with her hands or walk without pain. Doc. 10-8 at 68.

On October 6, 2021, Parks went to the emergency department at Northwest Medical Center with shortness of breath, chest pain, and dizziness. Doc. 10-15 at 100–01. She reported hypertension and migraines and was taking Neurontin. Doc. 10-15 at 106. She had full range of motion, strength, and sensation in her extremities. Doc. 10-15 at 107. She reported no history of falls and no use of an ambulatory aid. Doc. 10-15 at 123. She had a normal gait. Doc. 10-15 at 123.

On October 11, 2021, Parks saw Dr. Harrison with complaints including low back pain, opioid dependence, and migraine headache. Doc. 10-15 at 149. She requested refills of Suboxone and Topamax. Doc. 10-15 at 149. Her migraines were noted as stable with medication. Doc. 10-15 at 150.

On November 3, 2021, and December 6, 2021, Parks saw Dr. Harrison just for Suboxone and Adipex (medication for weight loss) refills. Doc. 10-15 at 144, 147.

On December 29, 2021, Parks saw Dr. Harrison and requested a refill of Topamax. Doc. 10-15 at 141. Her migraines were noted to be "at goal." Doc. 10-15 at 141.

On January 1, 2022, Parks saw Dr. Harrison for a routine, established follow-up visit for opioid dependence and obesity; she requested refills of Suboxone and Adipex. Doc. 10-15 at 139. Her neuropathy was noted as stable with medication. Doc. 10-15 at 140. She was able to perform activities of daily living with

medication. Doc. 10-15 at 140.

On January 4, 2022, Parks saw Dr. Randall about a knot on her back; he noted that she was pleasant and not in acute distress, and that she had normal motor function, reflexes, and sensation. Doc. 10-19 at 21. She was taking Neurontin and Topamax. Doc. 10-19 at 21.

On February 21, 2022, Parks saw Dr. Harrison with complaints of insomnia, migraine headaches, opioid dependence, and obesity. Doc. 10-19 at 48. She requested refills of medication including Suboxone and Topamax. Doc. 10-19 at 48.

On March 7, 2022, Parks saw Dr. Muhammad Husain for an initial psychiatric evaluation due to anxiety and depression. Doc. 10-19 at 17. He noted that she was taking Topamax and Neurontin, among other medications. Doc. 10-19 at 17. She was in no acute distress and had normal muscle strength and tone and normal gait and station. Doc. 10-19 at 18.

On April 6, 2022, Parks saw Dr. Husain for anxiety. Doc. 10-19 at 13. She had normal muscle strength and tone and steady gait and station. Doc. 10-19 at 14.

On May 16, 2022, Parks saw Dr. Harrison to refill her Suboxone, Neurontin, and Topamax. Doc. 10-20 at 52. Her migraines and neuropathy were "not at goal." Doc. 10-20 at 52.

On June 6, 2022, Parks saw Dr. Husain for anxiety. Doc. 10-20 at 2. She was in no acute distress and had normal muscle strength and tone as well as steady gait

and station. Doc. 10-20 at 4. It was recommended that she walk at a good pace for at least 15 minutes multiple times per week. Doc. 10-120 at 5.

On September 12, 2022, Parks saw Dr. Husain again; her strength and gait remained normal and she was again recommended walking. Doc. 10-20 at 7–8.

In June and July, 2022, Parks saw Dr. Harrison for Suboxone refills with no report of migraine or neuropathy. Doc. 10-20 at 46–48.

On August 10, 2022, Parks saw Dr. Harrison with complaints of opioid dependence, hypertension, and migraines, among other symptoms—but not including neuropathy. Doc. 10-20 at 42. She requested a refill of Topamax. Doc. 10-20 at 42. Her hypertension was uncontrolled at the time. Doc. 10-20 at 42. Her neuropathy was listed as stable, and her migraines were listed as "stable with meds." Doc. 10-20 at 43.

On September 12, 2022, Parks saw Dr. Husain with anxiety. Doc. 10-37 at 121. She was in no acute distress, had normal strength and muscle tone, and had steady gait and station. Doc. 10-37 at 122.

On September 22, 2022, Parks saw Dr. Harrison with complaints of cold symptoms and a request for a Suboxone refill. Doc. 10-20 at 40.

On October 5, 2022, Parks saw Nurse Practitioner Moore for a rash on her abdomen and a refill of Suboxone. Doc. 10-20 at 37.

On October 12, 2022, Parks had an emergency medical visit after

experiencing an episode of vision loss. Doc. 10-20 at 12. She reported a history of arthritis, hypertension, and migraines. Doc. 10-20 at 12. She was taking Neurontin and Topamax, among other medications. Doc. 10-20 at 12.

On December 5, 2022, Parks saw Dr. Harrison with complaints of opioid dependence, obesity, migraines, and neuropathy. Doc. 10-20 at 34. She received refills of Suboxone, Topamax, and Gabapentin. Doc. 10-20 at 34.

On January 3, 2023, Parks saw Dr. Harrison with a chief complaint of bilateral knee pain and swelling after "she fell in the parking lot at Walmart in Jasper, AL at 11:00 pm." Doc. 10-20 at 31. She reported low back pain and requested medication refills. Doc. 10-20 at 31.

On January 30, 2023, Parks saw Dr. Harrison with complaints including low back pain and neuropathy; she got refills of Suboxone and Gabapentin. Doc. 10-20 at 102. Her neuropathy was listed as "controlled with [G]abapentin." Doc. 10-20 at 103.

On February 8, 2023, Parks saw Dr. Husain for anxiety; she had normal strength and steady gait. Doc. 10-20 at 112–14. On March 28, 2023, Dr. Husain submitted a letter stating that, in his opinion, Parks could not be gainfully employed due to her mental health conditions. Doc. 10-20 at 120.

In February and March, 2023, Parks saw Dr. Harrison for Suboxone refills; she did not report issues with migraines or neuropathy. Doc. 10-20 at 95–100.

On April 25, 2023, Parks saw Nurse Practitioner Dyar with opioid dependence, hypertension, and dermatitis. Doc. 10-20 at 92. She reported falling within the home in the last month without injury and reported exercising. Doc. 10-20 at 92.

On May 23, 2023, Parks saw Nurse Practitioner Moore and requested refills of Gabapentin for neuropathy and Topamax for migraines. Doc. 10-20 at 89. She was walking three times weekly and reported that she had fallen "a week ago at graduation" but sustained no injuries. Doc. 10-20 at 89. Her hypertension was "not at goal," but her neuropathy and migraines were simply noted as needing medication refills. Doc. 10-20 at 90.

On July 11, 2023, Parks saw Dr. Husain for depression and anxiety. Doc. 10-37 at 129. She was in no acute distress, had normal muscle strength and tone, and had steady gait and station. Doc. 10-37 at 131.

On July 18, 2023, Parks went to the emergency department at Northwest Medical Center after a syncopal episode. Doc. 10-21 at 21. She was taking Gabapentin and Topamax, among other medications. Doc. 10-21 at 21–22. She reported no history of falls or use of ambulatory aid. Doc. 10-21 at 55.

On August 22, 2023, Parks saw Nurse Practitioner Dyar with complaints of back pain. Doc. 10-37 at 73. She was encouraged to increase exercise. Doc. 10-37 at 73.

On September 19, 2023, Parks saw Dr. Harrison with complaints including polyneuropathy. Doc. 10-37 at 69. She received a refill of Gabapentin. Doc. 10-37 at 69–70.

On October 17, 2023, Parks saw Dr. Harrison with complaints of low back pain; she requested refills of Suboxone and Topamax. Doc. 10-37 at 66.

On November 14, 2023, Parks saw Rebecca Allred, a nurse practitioner at Jerry Harrison Family Practice. Doc. 10-37 at 63. She reported low back pain and a fall after her ankle gave way, but she had sustained no injury. Doc. 10-37 at 63. She stated that she could not perform activities of daily living due to back pain. Doc. 10-37 at 64. Her migraines were described as "unstable" and she was prescribed Maxalt. Doc. 10-37 at 64.

On December 12, 2023, Parks saw Dr. Harrison with complaints including migraines; she received a refill of Topamax. Doc. 10-37 at 60–61. She reported falling at her home due to losing her balance. Doc. 10-37 at 60.

On January 9, 2024, Parks saw Dr. Harrison with low back pain and neuropathy. Doc. 10-37 at 56. She requested and received refills of Suboxone and Gabapentin. Doc. 10-37 at 56. She reported no falls. Doc. 10-37 at 56.

On February 7, 2024, and March 6, 2024, Parks saw Dr. Harrison with low back pain and got her Suboxone refilled. Doc. 10-37 at 50, 53. She reported no falls. Doc. 10-37 at 50, 53.

On April 3, 2024, Parks saw Dr. Harrison with back pain, hypertension, and panic attacks, but no mention of migraines or neuropathy. Doc. 10-37 at 47. She reported no falls. Doc. 10-37 at 47.

On May 1, 2024, Parks saw Dr. Harrison for a referral to a cardiologist. Doc. 10-37 at 44. She reported low back pain but not migraines or neuropathy. Doc. 10-37 at 44. She received refills of Suboxone and Topamax. Doc. 10-37 at 44–45.

On May 30, 2024, Parks saw Dr. Harrison with complaints of low back pain and polyneuropathy. Doc. 10-37 at 41. She requested and received refills of Suboxone and Neurontin. Doc. 10-37 at 41.

On June 27, 2024, Parks saw Dr. Harrison with panic attacks, opioid dependence, obesity, and neuropathy. Doc. 10-37 at 37. She reported that she had fallen on June 8 when she rolled her ankle while walking on the sidewalk in Fayette, Alabama. Doc. 10-37 at 37. She got a refill of Gabapentin for her neuropathy. Doc. 10-37 at 38.

On July 23, 2024, Parks saw Dr. Harrison for low back pain and wrist pain. Doc. 10-37 at 34. She got a Suboxone refill. Doc. 10-37 at 34–35.

On August 20, 2024, Parks saw Dr. Harrison for an annual wellness exam. Doc. 10-37 at 26. Her history included migraines and polyneuropathy. Doc. 10-37 at 26. She reported that she had fallen/had balance issues within the last two months, and that she did not exercise. Doc. 10-37 at 26. She complained of low back pain

and migraine headaches. Doc. 10-37 at 31. She had a steady gait. Doc. 10-37 at 31. She reported that she was able to complete activities of daily living with Suboxone. Doc. 10-37 at 32. She got a prescription for Maxalt for migraines. Doc. 10-37 at 32.

On September 17, 2024, Parks saw Dr. Harrison with complaints of low back pain and wrist pain; she had no falls and no exercise. Doc. 10-37 at 22. She performed activities of daily living independently with Suboxone. Doc. 10-37 at 23.

On October 7, 2024, Parks saw Dr. Harrison with complaints of low back pain, opioid dependence, anxiety, and COPD. Doc. 10-37 at 18. She had had no falls and was not exercising. Doc. 10-37 at 18. She was able to perform activities of daily living with Suboxone. Doc. 10-37 at 18. Parks was alert and oriented and in no acute distress upon examination. Doc. 10-37 at 18. She reported that she had a migraine during the visit. Doc. 10-37 at 19. Her migraines were listed as "unspecified, not intractable." Doc. 10-37 at 19.

On November 5, 2024, Parks saw Dr. Harrison with complaints including polyneuropathy and migraine headaches. Doc. 10-37 at 100. She received refills of Neurontin and Topamax. Doc. 10-37 at 100.

On December 4, 2024, Parks saw Dr. Harrison with complaints of low back pain, polyneuropathy, and COPD. Doc. 10-37 at 104. She received refills of Suboxone and Neurontin. Doc. 10-37 at 104. She was able to perform activities of

daily living independently. Doc. 10-37 at 106. Her polyneuropathy was described as "stable." Doc. 10-37 at 106.

## B. Social Security proceedings

### 1. Initial application and denial of benefits

On June 25, 2021, following the denial of a prior application for benefits (Doc. 10-4 at 2–21), Parks filed a new application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), alleging disability due to degenerative disc disease, obesity, bulging disks, osteoarthritis, rheumatoid arthritis, major depressive disorder, panic attacks, anxiety, migraines, GERD, hypertension, left knee surgery, hearing loss, and frequent urinary tract infections, with an alleged onset date of December 31, 2016. Doc. 10-4 at 27, 39; Doc. 10-7 at 2–10.

On February 14, 2022, Parks' application was denied at the initial level. Doc. 10-4 at 27–50; Doc. 10-5 at 17–18. On February 22, 2022, Parks requested reconsideration of the initial denial of her application for benefits. Doc. 10-5 at 21. Parks' application was denied at the reconsideration level. Doc. 10-4 at 51–70; Doc. 10-5 at 25–30.

On March 10, 2023, Parks requested a hearing before an ALJ. Doc. 10-5 at 32.

### 2. August 2023 ALJ hearing

On August 1, 2023, the ALJ held a telephonic hearing on Parks' application

for benefits. Doc. 10-3 at 40–43. During the hearing, Parks testified that she had panic attacks every day, multiple times per day. Doc. 10-3 at 50. She testified that she had a lot of pain, including migraines, and her doctor prescribed Suboxone, but it was not very helpful in controlling her pain. Doc. 10-3 at 53–54. She testified that her pain was at about an 8.5 out of 10 on a typical day. Doc. 10-3 at 54. She testified that she had neuropathy all over, for which she took Gabapentin, which caused her issues every day because it feels like pins and needles. Doc. 10-3 at 54–55. She testified that she had migraines about three to four times per month, and that she took Topamax. Doc. 10-3 at 55. Parks testified that she had experienced falls due to vertigo. Doc. 10-3 at 56. She testified that she could not do anything around the house. Doc. 10-3 at 57–58.

### 3. September 2023 ALJ decision and subsequent remand

On September 12, 2023, the ALJ entered an unfavorable decision. Doc. 10-3 at 15–33. The ALJ found that Parks had not been under a disability from December 31, 2016, through the date of the decision. Doc. 10-3 at 33.

On September 20, 2023, Parks appealed the ALJ's decision to the Appeals Council. Doc. 10-3 at 5; Doc. 10-6 at 22–27. On November 13, 2023, the Appeals Council denied Parks' request for review of the ALJ's September 12, 2023 decision, finding no reason to review the ALJ's decision. Doc. 10-3 at 2–6.

Parks then filed a complaint in the United States District Court for the Northern

District of Alabama, appealing the Commissioner's denial of benefits. Doc. 10-24 at 33–35. In response, the Commissioner filed an unopposed motion to remand the case for further administrative proceedings. Doc. 10-24 at 36–37. The district court granted the motion, reversing and remanding the case to the Commissioner. Doc. 10-24 at 38–39.

On July 25, 2024, the Appeals Council issued an order sending the case back to the ALJ. Doc. 10-24 at 40–45.

**4. January 2025 ALJ hearing**

On January 8, 2025, the ALJ conducted a telephonic hearing on Parks' remanded application for benefits. Doc. 10-22 at 32–34. In the hearing, the ALJ asked Parks what was "bothering [her] the most and keeping [her] from being able to work," and Parks responded that she had been diagnosed with COPD and had trouble with her breathing. Doc. 10-22 at 38–39. She also testified that she had osteoporosis that made her bones "weaker" and made her walk slower. Doc. 10-22 at 39. She testified that she had "a lot" of pain and Suboxone did not help anymore. Doc. 10-22 at 39. She testified that she had to lie down all the time, could not walk, and had missed important personal events due to pain. Doc. 10-22 at 39–40.

Parks testified that she was still having problems with neuropathy in her hands and feet that caused constant tingling and "feels like [she has] pins sticking [her]" and that were worse when she stood or walked. Doc. 10-22 at 41–42. She testified

that she could not stand more than five minutes without lying down, in part due to neuropathy, that she could only walk about 10 feet, and that she had falls about 3 or 4 times per week. Doc. 10-22 at 42–44. Parks testified that she had migraines "every week of every month of all year round," and they lasted about three or four days. Doc. 10-22 at 45. She testified that she had the migraines even on Topamax, and that she also took Rizatriptan because she tried Imitrex but it did not work, but she still had four migraines per month on average. Doc. 10-22 at 46. She testified that she was confined to her house because she was afraid to go outside and had panic attacks. Doc. 10-22 at 49.

Vocational Expert (VE) Patsy Bramlett testified that any absences over one day per month would rule out competitive work. Doc. 10-22 at 52. VE Bramlett testified that a hypothetical individual with Parks' age, education, work experience, and RFC could perform jobs in the national economy such as garment bagger, electrode cleaner, and tagger. Doc. 10-22 at 52–54.

**5. March 2025 ALJ decision (the decision on appeal)**

On March 24, 2025, the ALJ entered an unfavorable decision on Parks' application for benefits. Doc. 10-22 at 2–24. In the decision, the ALJ stated that the case was before the ALJ on remand from the Appeals Council after remand from the district court. Doc. 10-22 at 5. The ALJ stated that Parks had prior claims for benefits that were denied by ALJs in February 2013, April 2015, August 2019, and

March 2021, none of which she had appealed. Doc. 10-22 at 5. The ALJ found no basis for reopening the prior decisions, and therefore found that the pertinent period under review was from March 30, 2021, through the date of the decision. Doc. 10-22 at 6.

In the decision, the ALJ found that Parks met the requirements for insured status through December 31, 2023. Doc. 10-22 at 6. "After careful consideration of all the evidence," the ALJ concluded that Parks "has not been under a disability within the meaning of the Social Security Act from March 30, 2021, through the date of this decision." Doc. 10-22 at 7.

The ALJ applied the five-part sequential test for disability. Doc. 10-22 at 7–8; *see* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Winschel*, 631 F.3d at 1178. The ALJ found that Parks was insured through December 31, 2023, and that she had not engaged in substantial gainful activity during the period at issue. Doc. 10-22 at 8. The ALJ found that Parks had severe impairments of "major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, attention and concentration deficit disorder, insomnia, opioid dependence, migraine headache disorder, degenerative joint disease of the left knee, osteoarthritis of the lumbar spine, and essential hypertension." Doc. 10-22 at 9.

The ALJ found that Parks had non-severe impairments of obesity that had since resolved, syncope/collapse of recent onset in 2023 but not continuing during

2024, hypomagnesemia, hypokalemia, left retinal injury, osteopenia being managed with Fosamax without evidence of osteoporosis, polyneuropathy, and mild COPD. Doc. 10-22 at 9. The ALJ found that Parks' non-severe conditions were "being managed medically and/or are asymptomatic" and "should be amenable to proper control by adherence to recommended medical management and medication compliance," and that she had "not required inpatient hospitalization for symptom control or routine management by specialists for the foregoing conditions" and "[n]o aggressive treatment [had] been recommended or anticipated for these conditions." Doc. 10-22 at 9.

The ALJ also found that Parks did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations. Doc. 10-22 at 9–11. In determining whether Parks had an impairment or combination of impairments that met or equaled the listings, the ALJ considered Parks' headaches. Doc. 10-22 at 10.

The ALJ proceeded to determine Parks' RFC (or residual functional capacity), finding "after careful consideration of the entire record" that Parks could "perform light work" with the following exceptions: "never climb ladders/scaffolds; occasionally climb ramps and stairs; occasionally balance . . . ; occasionally stoop, kneel, crouch, and crawl; never work in exposure to hazards (unprotected moving mechanical parts/unprotected heights); she can only perform simple, routine, and

repetitive tasks but not at a production rate pace where the pace of one's work affects, or is affected by, the pace of others' work or by any externally controlled system or process; she can only respond appropriately to occasional changes in a routine work setting; and she can only have occasional, superficial interaction with coworkers and the public, with 'superficial' defined as such things as providing the time of day or directions about the workplace." Doc. 10-22 at 12.

The ALJ stated that the ALJ had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Doc. 10-22 at 12. The ALJ also stated that the ALJ had considered any medical opinions and prior administrative medical findings. Doc. 10-22 at 12.

In assessing Parks' RFC and the extent to which her symptoms limited her function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 10-22 at 12. The ALJ also stated that, where the claimant's statements about the intensity, persistence, or limiting effects of symptoms were not substantiated by objective medical evidence, the ALJ "must

consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 10-22 at 12.

In determining Parks' RFC, the ALJ summarized Parks' August 2023 hearing testimony, including her testimony that her physical pain kept her from working, and that her "pain is 'pretty much everywhere', including of her back, hips, and shoulder and includes migraines and fibromyalgia." Doc. 10-22 at 13. The ALJ stated that Parks reported pain at an 8.5 on a scale of 0 to 10, and that she "falls often, has balance issues, and has 3–4 migraines per month." Doc. 10-22 at 12. The ALJ stated that Parks testified that her "[n]europathy is all over pins and needles pain every day despite Gabapentin prescribed for use three times daily," and that she had at least three to four migraines per month despite daily Topamax use, and that the headaches lasted "2 to 7 days each and she is so nauseous she cannot eat or talk." Doc. 10-22 at 13.

The ALJ then summarized testimony from Parks' January 2025 hearing, stating that Parks testified that her "main problem is her recently diagnosed COPD." Doc. 10-22 at 13. The ALJ stated that Parks testified that "[s]he has constant tingling in the feet and neuropathy in her hands," had to lie down most of the time, was on Topamax for migraines and had migraines about four times per month that lasted three to four days, and had falls three to four times per week. Doc. 10-22 at 13.

The ALJ found "[a]fter careful consideration of the evidence" that Parks'

medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but Parks' "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Doc. 10-22 at 13.

The ALJ then provided an in-depth summary of Parks' medical history. In discussing Parks' history of knee pain, the ALJ found that, "[i]n March 2020, exam findings include full, normal range of motion of the extremities with normal gait and no strength or sensory deficits." Doc. 10-22 at 13. The ALJ found that in May 2021 Parks had "full range of motion of the extremities without edema or neurological finding," and that in April and May 2023 Parks reported exercising, walking three times per week, and attending a graduation. Doc. 10-22 at 14. The ALJ found that "in July 2023 all joints appeared normal with full range of motion, the claimant was able to fully weight-bear without any difficulty, and there were no motor, sensory, or reflex deficits." Doc. 10-22 at 14. The ALJ found that, in the medical evidence, Parks repeatedly denied falls and reported a steady gait. Doc. 10-22 at 14.

In summarizing Parks' treatment for back pain, the ALJ found that "Dr. Harrison's records since [2021] include the claimant reports she is independent with activities of daily living with Suboxone use and low back pain is assessed stable with such use," and that a "musculoskeletal exam in July 2023 is inconsistent with back-

related findings and includes no motor, sensory, or reflex deficits of the extremities." Doc. 10-22 at 14. The ALJ found that, during an exam in May 2024, Parks had "normal muscle strength and tone and steady gait and station," and repeatedly denied falls. Doc. 10-22 at 15.

The ALJ found that Parks' knee and low back pain were "not associated with motor, sensory, reflex, or range of motion deficits of the frequency, duration, and/or severity to limit the claimant greater than" in the RFC, and that the RFC "finding accommodates the claimant by restricting her from the exertional demands of medium and heavier work, limiting her to light work and including limitations on climbing and posturals for her back and knee conditions and with a restriction from hazards as safety precaution"; the ALJ found that "the medical evidence is inconsistent with symptoms or abnormalities to substantiate greater limitation than set out in the above finding." Doc. 10-22 at 15.

The ALJ also found that Parks' medical records showed "migraine headaches managed conservatively by primary care with medication without requiring intervention or management by a neurologist." Doc. 10-22 at 16. The ALJ found that, in March 2020, Parks was not on headache medication and reported no headaches. Doc. 10-22 at 16. The ALJ found that Parks "started on Topamax use and ha[d] no headache complaint for months after, until her March 2021 follow-up which is also when she reported having started back smoking," and that she then did

not report "complaints at her monthly visits again for months." Doc. 10-22 at 16. The ALJ stated that, in June 2021, Parks requested a refill of Topamax, "indicative it is beneficial." Doc. 10-22 at 16. The ALJ found that "[t]he records during 2022–2024 are no significant change, showing the claimant seeking refills of Topamax or Maxalt and without diagnosis of uncontrolled headaches." Doc. 10-22 at 16. The ALJ found that records from 2024 showed "migraines assessed not intractable and without status migrainosus on prescribed 'as needed' use of Maxalt as a headache abortive . . . and they also include migraines assessed stable on Topamax use." Doc. 10-22 at 16. The ALJ stated that the RFC "accommodates the claimant with restrictions on climbing and from workplace hazards in part as safety precaution," and that "[t]he claimant's headaches are not of the frequency, duration, and/or severity to limit her greater than in the above finding." Doc. 10-22 at 16.

The ALJ explicitly found that "[t]here is evidence in the record suggesting the claimant's activities/functioning are not as impaired as alleged." Doc. 10-22 at 19. Specifically, the ALJ pointed to medical records showing that Parks reported feeling good enough to bend, twist, and chase her grandchild, and 2023 medical records showing that she was at a Walmart at 11:00 pm. Doc. 10-22 at 19. The ALJ found that Parks had "alleged symptoms and limitations that contrast with other evidence in the record," including alleging that she was afraid to go outside, could not use the restroom normally, and needed help with bathing. Doc. 10-22 at 19. The ALJ found

that, in contrast with those allegations, Parks' medical records showed that she routinely went to doctor's visits unaccompanied, and reported that "she is independent with activities of daily living without evidence of any problems interacting appropriately with the public and medical staff while there and no objective evidence of being afraid." Doc. 10-22 at 19. The ALJ found that Parks "alleges she cannot pick up anything with her hands and that she can 'hardly move or walk anymore' . . . but this is not consistent with orthopedic and primary care records that include findings such as normal gait and no motor/strength deficits, or with ER exam records finding no motor, sensory, or reflex deficits and the claimant able to perform alternating rapid hand movements." Doc. 10-22 at 19.

The ALJ found that "[t]here is no objective medical evidence corroborating her allegation that she can walk only 5–10 feet before resting on a bad day and about 20 feet before resting on a good day," and that "[s]he reports using a cane and brace/splint every day . . . , which is not corroborated by the medical record that includes she ambulates independently with a normal gait and no observation of brace/splint use other than the short period before/after the left knee synovectomy." Doc. 10-22 at 19. The ALJ found that in July 2023 Parks had "no motor, sensory, or reflex deficits anywhere on musculoskeletal exam and gait was only limited then by an acute right foot injury," and that her "primary care records for 2024 include the claimant repeatedly denying any falls ('no falls') and reporting a steady gait,

which is without observed or prescribed use of any assistive device and also while the claimant reports independence with daily living activities and has no chronic knee complaints or objective findings on exams." Doc. 10-22 at 19–20.

The ALJ also found that Parks' statements about "the intensity, persistence, and limiting effect" of her symptoms were inconsistent with her own statements to her primary care physician, in which she stated that "Suboxone relieves her pain such that she is independent with activities of daily living and that pain medication has improved her function, increased her activity, and improved her quality of life." Doc. 10-22 at 20. The ALJ found that "Dr. Harrison's records, such as those for 2024, are 28-day follow-ups routinely that include when the claimant reports having a migraine at visits ('has one today'), such as October 2024, she is objectively in no acute distress with normal pulse and respiration rates, observed well groomed, alert, oriented, and Dr. Harrison's plan is only to 'continue to monitor during visits,'" and her migraines were "assessed 'stable' on Topamax use." Doc. 10-22 at 20.

The ALJ found further that, "[c]onsidering all of the above, including but not limited to the conservative course of care documented in the medical record, the claimant routinely seeking refills of medications indicative they are beneficial, the claimant's reports of good benefit from medication use to treating sources, the good objective findings on exams (i.e., no motor, sensory, reflex, or focal neurological deficit; normal gait and station; intact memory functions; good attention and

concentration; full extension of the knees with normal gait and no instability), and the results of imaging studies (i.e., no spinal stenosis, disk herniation/protrusion, or spinal cord or nerve root compromise; no internal derangement of the bilateral knees; normal cardiac/cardiovascular functions), the undersigned finds the claimant's symptoms are not of the frequency, duration, and/or severity as alleged or to limit her greater than set out in the above finding." Doc. 10-22 at 20.

The ALJ then assessed the persuasiveness of the medical opinions in the record. Doc. 10-22 at 20–22. The ALJ also considered a third-party function report submitted by Linda Murns, Parks' mother. Doc. 10-22 at 22. The ALJ found that, "[i]n sum, the above residual functional capacity assessment is supported by the record, when considered as a whole," because the "objective medical evidence, as detailed above, suggests greater sustained capacity than described by the claimant." Doc. 10-22 at 23.

The ALJ found that Parks had no past relevant work. Doc. 10-22 at 23. At step five, after considering Parks' age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Parks could perform. Doc. 10-22 at 23–24. The ALJ relied on the testimony of the VE and found that Parks would be able to perform the requirements of representative occupations such as garment bagger, electrode cleaner, and tagger. Doc. 10-22 at 24. Consequently, the ALJ found that Parks was capable of making a

successful adjustment to other work that exists in significant numbers in the national economy, and as a result had not "been under a disability, as defined in the Social Security Act, from March 30, 2021, through the date of this decision." Doc. 10-22 at 24.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards. Parks argues in her brief that the "ALJ erred at Step Two by finding Ms. Parks' polyneuropathy as a non-severe impairment," and that the ALJ erred by failing to adequately account for the limitations Parks' neuropathy caused. Doc. 18 at 16–19; *see* Doc. 24 at 1–3. Parks also argues in her brief that the ALJ failed to properly evaluate Parks' credibility regarding her migraines. Doc. 18 at 19–24; *see* Doc. 24 at 3. But the ALJ did not err to reversal in not including Parks' neuropathy as a severe impairment, and the ALJ properly assessed Parks' subjective testimony regarding her impairments and associated symptoms, as the ALJ's decision was based on the multi-part "pain standard," and substantial evidence supports the ALJ's decision not to fully credit Parks' subjective testimony regarding her symptoms—including her polyneuropathy and migraines.

### I. Any error in classifying Parks' neuropathy as a non-severe rather than severe impairment was harmless.

Any alleged error in the ALJ's failure to list Parks' neuropathy as a severe

impairment at step two of the sequential evaluation process was harmless. At step two of the five-part sequential test, the ALJ found that Parks had severe impairments of "major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, attention and concentration deficit disorder, insomnia, opioid dependence, migraine headache disorder, degenerative joint disease of the left knee, osteoarthritis of the lumbar spine, and essential hypertension." Doc. 10-22 at 9. The ALJ went on to find that Parks' polyneuropathy was a non-severe impairment. Doc. 10-22 at 9.

"Step two of the [sequential] test merely 'acts as a filter,'" so any failure to include Parks' neuropathy as a severe impairment was harmless; that is because, if the ALJ finds any severe impairment or combination of severe impairments at step two, that is sufficient for the ALJ to "proceed with the rest of the five-step analysis." *Medina v. Social Sec. Admin.*, 636 F. App'x 490, 492 (11th Cir. 2016) (quoting *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)); *see also Tuggerson-Brown v. Commissioner of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014) ("Based on our precedent and the regulations, therefore, it is apparent that there is no need for an ALJ to identify every severe impairment at step two."); *Gray v. Commissioner of Soc. Sec.*, 550 F. App'x 850, 853–54 (11th Cir. 2013).

Indeed, in this case, the ALJ found that Parks had several severe impairments, and then proceeded to the next steps in evaluating Parks' disability claim. Doc. 10-

22 at 9–10. Consequently, any failure at step two to specifically include Parks' neuropathy in the list of severe impairments was harmless. *See Medina*, 636 F. App'x at 492; *see also Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error standard in the Social Security context).

In addition, as discussed below, substantial evidence supported the ALJ's RFC finding, notwithstanding Parks' reported neuropathy. *See infra* Part III.B.

## II. The ALJ's decision properly was based on the multi-part "pain standard."

As a threshold matter, the ALJ's decision properly was based on the multi-part "pain standard." When a claimant attempts to establish disability through her own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies. That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024); 20 C.F.R. §§ 416.929, 404.1529 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [her] symptoms," and "evaluate [those] statements in relation to the

objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled." 20 C.F.R. §§ 416.929(c)(4), 404.1529(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, in analyzing Parks' RFC, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 10-22 at 12. The ALJ also stated that, where the claimant's statements about the intensity, persistence, or limiting effects of symptoms were not substantiated by objective medical evidence, the ALJ "must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 10-22 at 12.

The ALJ then applied the two-part test and found first that Parks' medically determinable impairments "could reasonably be expected to cause the alleged symptoms." Doc. 10-22 at 13. The ALJ then found second that Parks' "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Doc. 10-22 at 13. Thus, the ALJ's decision

was based on the proper legal standards.

## III. Substantial evidence supports the ALJ's decision to partially discredit Parks' subjective testimony regarding her impairments and associated symptoms.

Furthermore, with respect to the RFC finding (and at step two), substantial evidence supports the ALJ's decision not to fully credit Parks' subjective testimony regarding her impairments—namely, her neuropathy and migraines—and associated pain and symptoms.

### A. The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225. A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements." 20 C.F.R. § 416.929(c)(2); 20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the

intensity, persistence, or limiting effects of her symptoms, the ALJ must consider all of the evidence, objective and subjective. 20 C.F.R. § 416.929; 20 C.F.R. § 404.1529. Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, her precipitating and aggravating factors, her daily activities, the type, dosage, and effects of her medications, and treatments or measures that she has to relieve the symptoms. *See* 20 C.F.R. § 416.929(c)(3); 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [her] symptoms." *See* 20 C.F.R. § 416.929(c)(4); 20 C.F.R. § 404.1529(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210

(quotation marks and alterations omitted).[3] "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

### B. The ALJ properly explained the decision not to fully credit Parks' subjective testimony regarding her symptoms, and substantial evidence supports that decision.

The ALJ properly explained the decision to partially discredit Parks' subjective testimony regarding her pain and symptoms, and substantial evidence supports the ALJ's decision.

In her brief, Parks argues that, in determining her RFC (and at step two, *see supra* Part I), the ALJ erred in assessing her credibility and failed to account for limitations related to her polyneuropathy and migraines. Doc. 18 at 18–24. But the ALJ considered the record as a whole, and substantial evidence supports both the ALJ's finding that Parks' testimony was not entirely consistent with the record

---

[3] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting Social Security Ruling 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

evidence and the ALJ's RFC finding of light work with limitations.

The ALJ made an explicit finding that Parks' "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." Doc. 10-22 at 13. The ALJ then provided a detailed analysis of the record medical evidence, taking into consideration Parks' well-developed treatment record. Doc. 10-22 at 13–20.

The ALJ considered "the entire record." Doc. 10-22 at 12. Of relevance with respect to Parks' neuropathy, the ALJ considered Parks' hearing testimony that her "[n]europathy is all over pins and needles pain every day despite Gabapentin prescribed for use three times daily." Doc. 10-22 at 13. The ALJ also considered her subsequent hearing testimony that "[s]he has constant tingling in the feet and neuropathy in her hands." Doc. 10-22 at 13. In classifying Parks' polyneuropathy as non-severe, the ALJ found that the non-severe conditions were "being managed medically and/or are asymptomatic," and "should be amenable to proper control by adherence to recommended medical management and medication compliance," and that Parks had "not required inpatient hospitalization for symptom control or routine management by specialists for the foregoing conditions," and "[n]o aggressive treatment [had] been recommended or anticipated for these conditions." Doc. 10-22 at 9.

For Parks' migraines, the ALJ considered that Parks twice testified that she was on Topamax for migraines and had migraines about four times per month for days at a time. Doc. 10-22 at 13. The ALJ also considered that, throughout the record, there was evidence that Parks had normal range of motion and strength, as well as normal gait and repeated denial of falls. Doc. 10-22 at 13–15. The ALJ considered that, in her medical records, Parks reported exercising, walking, attending a graduation, and being able to independently perform activities of daily living. Doc. 10-22 at 14–15. The ALJ also took into consideration that Parks' medical records showed "migraine headaches managed conservatively by primary care with medication without requiring intervention or management by a neurologist," that she often did not report headaches, and that she got her Topamax prescription refilled which indicated that it was beneficial. Doc. 10-22 at 16. The ALJ found that Parks' headaches were not diagnosed as uncontrolled and were listed as not intractable. Doc. 10-22 at 16.

The ALJ also specifically found—and explained at length the finding—that "[t]here is evidence in the record suggesting the claimant's activities/functioning are not as impaired as alleged." Doc. 10-22 at 19. The ALJ pointed to records showing that Park felt good, chased her grandchild, and went to Walmart, despite alleging that she could not leave the house or use the restroom normally. Doc. 10-22 at 19. The ALJ found that Parks went to doctor's visits seemingly without issue and

reported being able to do activities of daily living, and that Parks' primary care and orthopedic visits included "findings such as normal gait and no motor/strength deficits, or with ER exam records finding no motor, sensory, or reflex deficits and the claimant able to perform alternating rapid hand movements," which conflicted with Parks' testimony that she could hardly move or use her hands. Doc. 10-22 at 19.

The ALJ found that "[t]here is no objective medical evidence corroborating her allegation that she can walk only 5–10 feet before resting on a bad day and about 20 feet before resting on a good day," and that Parks reported using a cane, but that cane use was not reflected in the medical records. Doc. 10-22 at 19. The ALJ found that Parks had broadly normal medical records in July 2023 and 2024. Doc. 10-22 at 19–20. The ALJ specifically found that "Dr. Harrison's records, such as those for 2024, are 28-day follow-ups routinely that include when the claimant reports having a migraine at visits ('has one today'), such as October 2024, she is objectively in no acute distress with normal pulse and respiration rates, observed well groomed, alert, oriented, and Dr. Harrison's plan is only to 'continue to monitor during visits,'" and that her migraines were "assessed 'stable' on Topamax use." Doc. 10-22 at 20.

Finally, the ALJ found that, "[c]onsidering all of the above, including but not limited to the conservative course of care documented in the medical record, the claimant routinely seeking refills of medications indicative they are beneficial, the

claimant's reports of good benefit from medication use to treating sources, the good objective findings on exams (i.e., no motor, sensory, reflex, or focal neurological deficit; normal gait and station; intact memory functions; good attention and concentration; full extension of the knees with normal gait and no instability), and the results of imaging studies (i.e., no spinal stenosis, disk herniation/protrusion, or spinal cord or nerve root compromise; no internal derangement of the bilateral knees; normal cardiac/cardiovascular functions), the undersigned finds the claimant's symptoms are not of the frequency, duration, and/or severity as alleged or to limit her greater than set out in the above finding." Doc. 10-22 at 20.

As set forth above, this court cannot reweigh the evidence (*see Winschel*, 631 F.3d at 1178), and the ALJ provided an extensive explanation, supported by numerous specific citations to the record, to explain the finding that Parks' statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record.

In addition, the limitations placed on Parks' RFC to perform light work show that the ALJ partially credited Parks' subjective testimony when finding her RFC. The ALJ included limitations in the RFC to account for Parks' pain, finding that Parks could never climb ladders and scaffolds, could rarely climb ramps and stairs, could only occasionally balance, stoop, kneel, crouch, and crawl, could not work

with exposure to hazards, and could only perform simple, routine, and repetitive tasks. Doc. 10-22 at 12. The ALJ also found specifically that the RFC accommodated Parks' migraines "with restrictions on climbing and from workplace hazards in part as safety precaution," and that "[t]he claimant's headaches are not of the frequency, duration, and/or severity to limit her greater than in the above finding." Doc. 10-22 at 16.

Further, "[t]he residual functional capacity is an assessment based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments." *Lewis*, 125 F.3d at 1440. And, according to Social Security Ruling 96-8P, "RFC is not the least an individual can do despite his or her limitations or restrictions, but the *most*." 1996 WL 374184, at *2 (July 2, 1996) (emphasis in original).

In this regard, the ALJ's decision considered information based on both objective and subjective evidence, accounting for evidence supporting Parks' testimony, while also clearly identifying evidence calling into doubt Parks' subjective testimony about the intensity, persistence, and limiting effects of her symptoms. *See* 20 C.F.R. § 416.929; 20 C.F.R. § 404.1529.

Thus, the ALJ's decision and RFC finding included the necessary "explicit and adequate reasons" for partially discrediting Parks' subjective testimony about her symptoms. *Wilson*, 284 F.3d at 1225. The ALJ "considered [Parks'] medical

condition as a whole," and the decision was not just a "broad rejection" of Parks' subjective testimony. *Dyer*, 395 F.3d at 1210.

Substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158), and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the Commissioner's findings" (*Crawford*, 363 F.3d at 1158–59 (quoting *Martin*, 894 F.2d at 1529)). Here, the record contains such relevant evidence as a reasonable person would accept as adequate to support the ALJ's conclusion that Parks' symptoms—including of her neuropathy and migraines—were not of the frequency, duration, and/or severity alleged and that Parks could perform light work with limitations. *See Crawford*, 363 F.3d at 1158.

Parks' medical records show that she took Gabapentin/Neurontin for neuropathy and Topamax for migraines and consistently requested refills without seeking to change her mediation; both conditions were listed as "stable," "managed," or "at goal" on several occasions. *See, e.g.*, Doc. 10-14 at 11, 24, 31–32, 42, 45, 48–49, 53, 55, 58–59; Doc. 10-15 at 140–41, 149, 152–53; Doc. 10-20 at 43, 52, 103; Doc. 10-35 at 166; Doc. 10-37 at 66, 100, 104. Parks reported to her primary care physician on several occasions, including in 2024, that she was able to independently perform activities of daily living with pain medication. *See* Doc. 10-14 at 55, 59;

Doc. 10-15 at 140; Doc. 10-37 at 18, 23, 106. Parks often did not mention neuropathy or migraines at her primary care appointments. *See, e.g.*, Doc. 10-9 at 5; Doc. 10-14 at 21, 29; Doc. 10-15 at 144, 147; Doc. 10-20 at 37, 40, 46–48, 95–100; Doc. 10-37 at 44, 47, 50, 53. Parks stated that she could not pick up anything with her hands or walk without pain and needed a walker or cane, but her medical records show no incidents of problems picking things up, Parks consistently did not have a cane or walker at appointments, she reported no use of an ambulatory aid, and she had normal gait. *See, e.g.*, Doc. 10-8 at 68; Doc. 10-15 at 123; Doc. 10-19 at 14, 18; Doc. 10-20 at 4, 7–8, 112–14; Doc. 10-21 at 55; Doc. 10-35 at 167; Doc. 10-37 at 31, 122, 131.

In a function report, Parks stated that she could not get out of bed when she had migraines, but she attended a doctor's appointment with a migraine. Doc. 10-8 at 62; Doc. 10-37 at 19. Parks testified that she was confined to her house, but medical records show Parks being able to do things like go out to Walmart or Fayette, walk for exercise, go to a graduation, and chase her grandchild. Doc. 10-16 at 11; Doc. 10-20 at 4, 7–8, 31, 89; Doc. 10-22 at 49; Doc. 10-37 at 37, 73. In a third-party function report, Parks' mother expressed that Parks was very limited, but did not mention neuropathy or migraines, and Parks testified in her 2025 hearing that her main problem preventing her from working was COPD—not neuropathy or migraines. Doc. 10-8 at 40–47; Doc. 10-22 at 13.

A reasonable person would accept this evidence from the record as adequate to support the ALJ's conclusion that the symptoms of Parks' neuropathy and migraines were not as severe as alleged, and that Parks could perform light work with limitations. *See Crawford*, 363 F.3d at 1158. There is sufficient evidence in the record to support the ALJ's findings that Parks' testimony regarding her symptoms—especially regarding her neuropathy and migraines—was not consistent with the record as a whole and that Parks was able to perform light work with limitations. Accordingly, substantial evidence supports the ALJ's decision. The ALJ clearly articulated a credibility finding that was supported by substantial evidence, and the court cannot disturb that finding. *See Foote*, 67 F.3d at 1562.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C § 405(g)), the Commissioner's decision is **AFFIRMED**. The court separately will enter final judgment.

**DONE** and **ORDERED** this September 23, 2026.

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE